**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.: 21-cr-20515-JEM/Becerra

UNITED STATES OF AMERICA,

v.

JIMMY DALE WILLIAMS,

    Defendant.

_____/

## REPORT AND RECOMMENDATION ON DEFENDANT'S COMPETENCY

**THIS CAUSE** is before the Court on the issue of Defendant Jimmy Dale Williams's competency to stand trial.[1]  Specifically, on March 30, 2022, Defendant filed a Motion for Competency Hearing.  *Id*.  The Government filed its Response conceding that a competency hearing was appropriate given the information disclosed in the Motion, and advising that both parties agreed that the Court should appoint a Federal Bureau of Prisons ("BOP") psychologist to evaluate Defendant's competency to stand trial.  ECF No. [29].  The Court did so by Order Requiring Competency Evaluation entered on April 5, 2022.  ECF No. [30].

Pursuant to the Court's Order, Defendant was evaluated by two psychologists, Dr. Lisa B. Feldman, a forensic psychologist with the Federal Bureau of Prisons, and Dr. Ted Cunliffe, a licensed psychologist retained by defense counsel.  Dr. Feldman and Dr. Cunliffe issued their respective reports, ECF Nos. [34-1], [39-1], and the undersigned held a competency hearing on August 1, 2022 ("First Competency Hearing"), ECF No. [57].

---

[1] This matter was referred to the undersigned by the Honorable Jose E. Martinez, United States District Judge, ECF No. [41].

After the hearing and at the request of the undersigned, the parties filed supplemental briefs to address the relevant legal standard and whether the Court had the authority to order a full evaluation of Defendant before making a final competency determination. ECF Nos. [59], [60]. The undersigned held a hearing on the supplemental briefing and, on August 17, 2022, ordered that Defendant undergo further psychiatric evaluation to determine his mental competency to stand trial. ECF No. [62].

Pursuant to the Court's Order requiring that he be further evaluated, Defendant was evaluated by Dr. Kristin Conlon, a forensic psychologist with the Federal Bureau of Prisons, and again by Dr. Cunliffe. Dr. Conlon issued a report on November 23, 2022, ECF No. [75-1], and on March 12, 2023, Dr. Cunliffe issued an addendum to his original report. ECF No. [91-1].

The undersigned held a second competency hearing on March 14, 2023. ECF No. [94]. Both Dr. Conlon and Dr. Cunliffe testified at the second competency hearing. *See id.*

Having carefully considered the reports submitted by Drs. Feldman, Conlon and Cunliffe, their testimony at the Competency Hearings, the argument of counsel and the applicable law, for the reasons explained below, the undersigned finds that Defendant Jimmy Dale Williams has a rational as well as factual understanding of the proceedings against him, and a sufficient present ability to consult with his lawyers with a reasonable degree of rational understanding. Accordingly, it is **RECOMMENDED** that the Court find Defendant is presently competent to stand trial.

## I.   BACKGROUND AND FACTUAL FINDINGS

On October 15, 2021, Defendant was charged by Indictment with simple carjacking in violation of Tile 18, United States Code § 2119(1), which carries a maximum penalty of fifteen years' imprisonment. ECF No. [3]. A Superseding Indictment was returned on March 18, 2022,

charging Defendant with carjacking involving serious bodily injury in violation of Tile 18, United States Code § 2119(2), which increased the maximum penalty to twenty-five years' imprisonment. ECF No. [27]. Counsel has indicated that Defendant may be facing a maximum of life imprisonment as a result of possible sentencing enhancements. Defendant has been held in pretrial detention since his initial appearance on November 5, 2021.

## A. Defendant's Background.

Defendant reported the following information concerning his early childhood to the examining psychologists. Specifically, Defendant reported trauma as a child, including witnessing his biological father kill his stepfather. As for his education, he attended several schools and earned poor grades (Cs, Ds and Fs), but did not repeat any grade levels. Defendant was not placed in special education classes nor did he receive disability benefits, although Defendant described himself as a slow learner. Defendant exhibited behavioral problems at school, resulting in several suspensions, and was bullied by peers. Defendant also reported that he was diagnosed with ADHD as a child, for which he received outpatient therapy for a few months. During his forensic interview with Dr. Conlon, Defendant described his most significant mental health issue during childhood as relating to "trouble pronouncing words, difficulty focusing, and feeling down and sad that 'no one love him'." ECF No. [75-1] at 6. Defendant dropped out of high school in 11th grade but reported to Dr. Cunliffe that he obtained his Graduate Equivalency Diploma ("GED") in 1997 while incarcerated in the Miami-Dade County Department of Corrections.[2] Defendant reports a good relationship with his mother and siblings, as well as his adult daughter.

---

[2] Defendant informed Dr. Conlon that he dropped out of high school in 9th grade, which Dr. Conlon notes is inconsistent with the information Defendant provided to Dr. Feldman and Dr. Cunliffe, as well as his educational records. Defendant also stated to Dr. Conlon that he was unsure if he obtained a GED certificate.

Defendant has an extensive history of substance abuse and criminal activity since adolescence.  He was incarcerated for more than a decade.  When not incarcerated, Defendant was employed in landscaping from his teenage years through 2019, following which he worked full-time as a landscaper at the Hard Rock Stadium in Miami, Florida until his current arrest.  Defendant has not been fired from his previous jobs and did not report conflict with his employers or coworkers.

The parties agree that it is Defendant's intellectual functioning, not a psychological illness, that is at issue.  Indeed, Defendant has been prescribed medication for depression, but otherwise the available documentation did not identify significant mental health issues.  Defendant was involuntary hospitalized on one occasion as a likely result of severe substance intoxication, rather than mental illness.  Defendant engaged in self-harm behavior on a few occasions while incarcerated, although the related documentation and physical evidence (scars) which the evaluating psychologists reviewed indicated to them that Defendant engaged in such behavior out of dissatisfaction with his conditions, rather than a desire to die.  During his monitored telephone conversations while at FDC-Miami, Defendant did not mention mental health concerns.

In light of the above, the undersigned focuses on those portions of the expert reports and hearing testimony that relate to Defendant's intellectual functioning.

**B.  Dr. Feldman's Report**

Dr. Lisa Feldman, a BOP Forensic Psychologist at FDC-Miami, conducted a competency evaluation of Defendant between April and May, 2022.  She reviewed the following documentation in connection with her evaluation: (i) undated educational records, (ii) medical records from Jackson Health System of various dates; (iii) National Crime Information Center report dated April 26, 2021, (iv) the Indictment, (v) BOP central, medical and psychological

records of Defendant from November 2021 through the date of her report, (vi) Pretrial Services Report dated November 5, 2021, (vii) Defendant's Motion for Competency Hearing, along with the Government's response and the Court's Order Requiring Competency Evaluation, (viii) United States Marshals Service Individual Custody/Detention Report dated April 8, 2022, and (ix) monitored telephone conversations of Defendant from FDC-Miami on various dates.  ECF No. [39-1] at 5.

Dr. Feldman, and two psychology graduate students under her supervision, administered the following psychological tests to Defendant: (i) Clinical Interview, (ii) Mental Status Examination, (iii) Wechsler Abbreviated Scale of Intelligence-Second Edition ("WAIS-II"), (iv) Validity Indicator Profile ("VIP"), (v) Test of Memory Malingering ("TOMM"), (vi) Personality Assessment Inventory ("PAI"), (vii) Structured Interview of Reported Symptoms, Second Edition ("SIRS-2"), (viii) Inventory of Legal Knowledge ("ILK"), and (ix) Georgia Court Competency Test – Mississippi State Hospital ("GCCT-MSH").  *Id*. at 6.  They also received information from FDC-Miami Correctional Services staff regarding Defendant's adjustment to his unit, and incarceration in general, to better gauge Defendant's adaptive and interpersonal skills.  *Id*. at 5.

Dr. Feldman issued her report on June 3, 2022.  Dr. Feldman described Defendant as exhibiting organized, rational, sequential, and coherent thought processes.  *Id*. at 10.  His memory appeared intact for immediate, remote, and recent events.  *Id*.  Dr. Feldman stated that Defendant demonstrated adequate attention and concentration skills, and did not appear confused.  *Id*.

Defendant's overall intellectual functioning was estimated to fall in the Extremely Low range based upon his full-scale IQ as measured by his performance on the WAIS-II test.  *Id*. at 11. The WAIS-II estimates intelligence and is composed of four subtests that measure different aspects of intellectual performance.  *Id*.  Defendant's scores suggested that his verbal skills are less

developed than his nonverbal skills. *Id*. Dr. Feldman acknowledged that if Defendant's scores are "taken at face value," his full-scale IQ "could correspond to an Intellectual Disability." *Id*. However, Dr. Feldman had "minimal confidence" that Defendant's WAIS-II scores are "true indications of Defendant's abilities" for three reasons: (1) a diagnosis of intellectual disability requires "prior classification of intellectual and adaptive functioning deficits with onset during the development period," and none of the available records suggested such a history; (2) Defendant did not demonstrate adaptive or functioning deficits during the evaluation period or in monitored telephone conversations, and (3) there were "indications that the defendant did not put forth a motivated effort during the present evaluation period and attempted to impress as mentally impaired." *Id*. at 12. With respect to this last reason, Dr. Feldman stated that Defendant's scores on the VIP test, which identifies response styles on cognitive tasks or tests of cognitive functioning, indicated that he was "not invested in making his best effort and/or g[ave] up too easily on items that he might have answered correctly with more effort and attention." *Id*. Dr. Feldman also stated that Defendant's scores on the TOMM test, which distinguishes between genuine and fabricated memory deficits, "suggest[ed] that he was fabricating or grossly exaggerating memory impairment." *Id*.

According to Dr. Feldman's report, Defendant accurately described the role of a defense attorney, but stated that he did not know the roles of the judge, jury and prosecutor. *Id*. at 15. Defendant also stated that he was charged with "robbery and carjacking." *Id*. Defendant's score on the GCCT-MHS competency test "was significantly lower than the scores obtained in a population of individuals deemed incompetent to stand trial" and was "consistent with that of individuals feigning incompetence." *Id*. Similarly, Defendant's score on the ILK, which measures response style for legal knowledge related to competency to stand trial, "was far below persons

determined incompetent to stand trial and more similar to individuals malingering trial incompetency." *Id*. at 16.

Dr. Feldman diagnosed Defendant with various substance abuse disorders, antisocial personality disorder and malingering. *Id*. at 13-15. Dr. Feldman recommended that Defendant be found competent to stand trial because he "demonstrated no active mental states that would interfere with his rational understanding of the proceeding against him or his ability to assist toward his defense, if he was motivated to do so." *Id*. at 16-17.

### C. Dr. Cunliffe's Report

Dr. Ted Cunliffe is a licensed psychologist retained by defense counsel. Dr. Cunliffe conducted a competency evaluation of Defendant on April 6, 2022, and issued his report on April 18, 2022. ECF No. [34-1]. He reviewed the following documentation in connection with his evaluation: (i) Medical and mental health records from Jackson Health System between March 8, 2021 and April 11, 2021, and September 26, 2021 through November 5, 2021; (ii) Miami-Dade Public School records of Defendant from 1991 through 2000; (iii) Pretrial Services Report dated November 5, 2021; (iv) the Indictment, and (v) Offense Incident Report dated July 25, 2021. *Id*. at 2. Dr. Cunliffe also consulted with Defendant's attorneys and reviewed Miami-Dade Police body cam footage from the incident giving rise to the Indictment. *Id*.

Prior to Dr. Cunliffe's meeting with Defendant in April 2022, his colleague, Dr. Christina Brumer, administered the following psychological tests to Defendant: (i) WAIS-IV on February 16, 2022, (ii) VIP on March 23, 2022 and (iii) Trauma Symptom Inventory, Second Edition ("TSI-2") on February 27, 2022. *Id*. For his part, over a four (4) hour period on April 6, 2022, Dr. Cunliffe conducted a clinical and forensic interview of Defendant, mental status examination and a competency to stand trial and competency to waive Miranda rights evaluation. *Id*. He also

administered to Defendant the (i) ILK, (ii) Shipley-2, which is comprised of a vocabulary subtest and an abstraction subtest, (iii) Criminal Competence Assessment Procedure, and (iv) Miranda Rights Comprehension Instruments.  *Id*.

Dr. Cunliffe explained that it was necessary to repeat information to Defendant during the evaluation because "[Defendant's] attention was variable, he was easily distracted, and his verbal comprehension and expressive language abilities were extremely low."  *Id*. at 3.  Dr. Cunliffe found that Defendant's attention and concentration problems appeared more consistent with a trauma disorder than ADHD, but Dr. Cunliffe agreed at the Competency Hearing that Defendant's trauma "does not have direct bearing on his competency."  *Id*. at 5; ECF No. [57] at 85:8-10.

As for Defendant's intellectual functioning, Defendant scored in the bottom two percent on the WAIS-IV Verbal Comprehension Index.  ECF No. [34-1] at 6.  Dr. Cunliffe found that Defendant's intellectual functioning "did not appear impaired" although his "receptive and expressive language abilities were very low."  *Id*.  Defendant received an "average score" on the WAIS-IV Matrix Reasoning Subtest, but scored in the fifth percentile on the Shipley-2 Abstraction Subtest.  *Id*. at 8.  Dr. Cunliffe found that Defendant's ability to abstract was "moderately to severely impaired" because Defendant's scores on verbal and unstructured exercises was "very low."  *Id*.  Dr. Cunliffe also found that Defendant had "adequate insight into his situation" but believed that Defendant was just "parroting what his attorneys had told him without full knowledge about what the words meant."  *Id*.

Dr. Cunliffe concluded that Defendant was competent in two areas: (1) appreciation of charges and allegations[3] and (2) capacity for appropriate courtroom behavior.  *Id*. at 9, 11.  Also,

---

[3] Dr. Cunliffe confirmed at the Competency Hearing that the word "inadequate" in the sentence that reads "[o]verall [Defendant's] appreciation of the charges appeared inadequate," *id*. at 9, is a typographical error.  ECF No. [57] at 29:22-30:3

he found that Defendant correctly identified and described the range of possible sanctions, and correctly described the difference between pleas of guilty and not guilty, as well as provided adequate definitions of a sentence and appeal.  *Id*. at 10, 11.  Further, Dr. Cunliffe found that Defendant had an "adequate understanding of the adversarial nature of the American legal process and the roles of different professionals and witnesses in court."  *Id*.  Defendant's "comments regarding the events which lead to the offense seemed rational," and Dr. Cunliffe found that Defendant was able to disclose relevant facts of his case to counsel and the court, understood that all communications between him and his attorneys are confidential, and had a good working relationship with defense counsel.  *Id*. at 11.

Notwithstanding these findings, Dr. Cunliffe concluded that Defendant was incompetent in the following areas: (i) appreciation of possible sanctions, (ii) appreciation of the adversarial nature of the legal process, and (iii) capacity to disclose relevant facts to counsel, testify and participate in his defense.  *Id*. at 9-11.  With respect to appreciation of possible sanctions, Dr. Cunliffe stated that "[a]lthough Mr. Williams was able to describe what occurs when the different sanctions are applied, his functional understanding of them seemed inadequate."  *Id*. at 9.   It appears that Dr. Cunliffe's based this assertion on the fact that Defendant was unable to "clarify or expand" on his answer that the difference between jail and prison is "you get a number, and they send you far away" and did not know the purpose of community service or why he would have to provide the court "with a sheet showing you had completed the hours."  *Id*.  Dr. Cunliffe also noted that Defendant did not seem to understand the difference between Not Guilty and Not Guilty by Reason of Insanity, and could not properly explain a plea of No Contest.  *Id*. at 10.   Dr. Cunliffe believed that Defendant "seemed to be parroting back definitions provided with limited understanding."  *Id*. at 10.

With respect to appreciation of the adversarial nature of the legal process, Dr. Cunliffe noted that Defendant did not seem to understand the difference between a lay witness and an expert witness, and was "unable to appreciate or explain the difference between State and Federal court." *Id*. at 10-11.  As for the final area of alleged incompetence, Dr. Cunliffe stated that Defendant's "capacity to make legal decision, weigh his options, understand legal procedure, and exercise his legal rights did not appear adequate" and "his capacity to understand legal terms and procedure, and his legal rights, and avoid self-incrimination seemed to be very low." *Id*. at 11.  The basis for these statements is unclear, but Dr. Cunliffe noted that Defendant did not seem to understand the meaning of a plea bargain or the plea bargain process despite repeated explanation. *Id*.  However, when Dr. Cunliffe and Defendant discussed a plea bargain in the context of this case, Defendant stated that "my lawyer says they say 25 years." *Id*.  Further, Dr. Cunliffe believed that Defendant was "prone to acquiescing" and did not appear to understand his defense counsel's strategy. *Id*.

Dr. Cunliffe diagnosed Defendant with various substance abuse disorders, Posttraumatic Stress Disorder with dissociative symptoms and delayed expression, Major Depressive Disorder and Unspecified Neurocognitive Disorder. *Id*. at 8-9.  He opined that Defendant was not competent to waive his Miranda rights when he was interrogated by the police because he scored in the "very low/borderline" range with respect to his right to silence and his comprehension of Miranda vocabulary, and "extremely low" with respect to the nature of interrogation and the function of rights in interrogation. *Id*. at 12.  However, Dr. Cunliffe found that Defendant's comprehension of his right to counsel was adequate, and his scores on "Comprehension of Miranda Rights-II" was in the "low average" range. *Id*.

Ultimately, Dr. Cunliffe opined that Defendant is incompetent to stand trial. *Id*. at 13.  Dr. Cunliffe explained that "the source of [Defendant's] competency problems appears to rest on two

factors: a possible neurocognitive disorder and severe verbal comprehension problems." *Id*.  He recommended that Defendant undergo an additional two or three months of treatment in order: "1) to attempt competency restoration treatment since his capacity for attaining competency is not currently fully understood, 2) to further evaluate the nature of his cognitive problems, and 3) more closely assess his difficulties which bear on his competency." *Id*. at 14.  Finally, Dr. Cunliffe also concluded that it is "premature" to conclude that Defendant cannot be restored to competency "given the information currently available and his limited history of competency restoration treatment." *Id*.

### D.  The First Competency Hearing

The Court held a competency hearing on August 1, 2022 at which Dr. Cunliffe and Dr. Feldman testified.  The undersigned summarizes the relevant portions of their testimony below.

### 1.    Dr. Cunliffe's Testimony

Dr. Cunliffe earned a Ph.D. in clinical psychology in 2002, and specializes in forensic psychology.  *Id*. at 5:6-8, 13-15.  He worked as a contract therapist for BOP for two years, and as a psychologist for the Florida Department of Corrections for approximately twenty years, *id*. at 5:16-25. He has performed more than 400 competency evaluations during his career.  *Id*. at 6:3-7.

Dr. Cunliffe described Defendant as a "lower functioning individual in terms of verbal performance." *Id*. at 50:4-6.  He explained that he typically had to rephrase questions and explain information to Defendant several times during the competency evaluation because Defendant had problems understanding concepts.  *Id*. at 11:2-4.  Dr. Cunliffe stated that Defendant's verbal comprehension problems suggest low functioning which, in his opinion, "would prevent Mr. Williams from appreciating the nature and consequences of the proceedings against him and assist his attorneys in his defense." *Id*. at 36:24-37:7.  However, Dr. Cunliffe readily acknowledged that

he "did not have enough information to diagnose [Defendant] with a learning disability or something along those lines, so that would not qualify as a disease or defect per se." *Id.* at 36:13-16; *see also Id.* at 45:11-12 (stating that Defendant "did not demonstrate intellectual impairment at the range of an intellectual disability."). Dr. Cunliffe also agreed that a person could have a diagnosed mental disorder or a low or borderline IQ and still be competent to proceed. *Id.* at 76:22-77:4.

Dr. Cunliffe confirmed that Defendant's attention was "variable but he was able to focus his attention when asked." *Id.* at 78:10-11. With respect to Defendant's intellectual functioning, Dr. Cunliffe noted that Defendant scored in the borderline range on the WAIS-IV and in the first percentile on the Shipley-2 vocabulary subtest. *Id.* at 21:16-24, 46:16-25. Dr. Cunliffe explained that a score of "extremely low" on the WAIS-IV is worse than a score of "very low" or "borderline to low average" and a score of "low or borderline to average range doesn't mean that [Defendant] is intellectual impaired." *Id.* at 76:5-7 Also, Dr. Cunliffe pointed out that the Shipley-2 is a "screener for intellectual function" and would not be the basis on which to diagnose an intellectual disability. *Id.* at 21:22-22:5.[4] Based on his evaluation of Defendant, Dr. Cunliffe believed that Defendant was merely repeating information verbatim (i.e., parroting) and has a desire to acquiesce. Dr. Cunliffe stated that these characteristics impact competence because it "relates directly" to Defendant's ability to work with and assist his attorneys in his defense, and renders Defendant "liable to say he does know when he doesn't." *Id.* at 20:6-18, 30:23-31:7.

In addition to his interviews and testing, Dr. Cunliffe reviewed three monitored telephone calls that Defendant made while at FDC-Miami. The first call took place on March 21, 2022,

---

[4] Dr. Cunliffe utilized the Shipley-2 to test the reliability of Defendant's scores on the WAIS-IV that Dr. Brumer administered. *Id.* at 24:12-14.

during which Defendant stated "they're coming with a plea now, they're coming here talking about 25 years.  They added another charge, they are fitting to indictment me on another charge.  The max of the first is 15 years."   *Id*. at 61:1-4.  When asked for his impression of these statements, Dr. Cunliffe stated that he was "not so sure" that Defendant "fully comprehends what is going and the reason for that, and what the differences would be, and whether he would be able to fully participate in a plea agreement or a plea colloquially," but did not provide any explanation or basis for this conclusion.  *Id*. at 61:11-16.  Dr. Cunliffe further stated that the did not believe Defendant's statements indicated he understood the possible sanctions against him because Defendant did not say "what kinds of things would he need to consider, what he was going to talk to his attorney about, things of that nature."  *Id*. at 113:15-23.

During this call, Defendant also made statements regarding the impact of his criminal history on plea negotiations and the effect of gain time.  *Id*. at 116:24-117:8. As to the latter, Defendant stated that "I was gonna take 15, I will be out in 11."  *Id*. at 117:8.  Dr. Cunliffe agreed that this statement showed that Defendant "clearly understands that there is gain time in the system and he is analyzing what amount of gain time he might get if he takes, for example, 15 years, as opposed to 20 years, as opposed to 25 years."  *Id*. at 117:17-21.

The second call took place on March 28, 2022, during which Defendant stated "If I go to trial and lose, they are going to give me a life sentence, but they can only hit me with it if I lose the trial.  Right now they can't hit me with it" and "tell momma, man, I need her healthy, tell momma I need her healthy, you know what I mean.  I need her to stay – stay alive so I can see her again."  *Id*. at 61:17-22, 62:4-6).  Dr. Cunliffe agreed that these statements demonstrate that Defendant understands the possibility of receiving a life sentence if he goes to trial.  *Id*. at 61:23-62:2 ("I think he understands that.  That is consistent with the report where I opine that he is

competent in relation to his appreciation of the charges"); *Id*. at 62:9-10 ("I think he understands that the number of years that would be involved."). Nonetheless, Dr. Cunliffe stated that Defendant does not fully understand the adversarial nature of the criminal process because "he seemed very confused about state attorneys versus U.S. Attorneys." *Id*. at 62:15-18. Dr. Cunliffe also stated, without explanation, that Defendant's statement regarding his mother's health "reflect[s]" that Defendant "doesn't have the capacity" to "direct his attorneys as to what he wants …[or] fully comprehend what is going on in court, and what people are saying and what is happening … [or] understand the reasoning around any kind of decision [or] weighing alternatives." *Id*. at 62:19-63:2.

The third call occurred on April 6, 2022, during which Defendant stated that "my lawyer got a psychologist to come in and see me, so tell momma, if they can, tell her, you know what I mean, to tell them there is something wrong." *Id*. at 63:9-15. Dr. Cunliffe stated that this statement shows that Defendant "recognizes that would be important information for the Court to know about." *Id*. at 63:18-20.

Moreover, in response to Dr. Feldman's report, Dr. Cunliffe offered the following rebuttal. He stated that the WAIS-II that Dr. Feldman administered should not be used to diagnose intellectual impairment, or for legal, judicial, or quasi-legal purposes. *Id*. at 45:20-46:12. Dr. Cunliffe also stated that the VIP test, which Dr. Feldman administered, should not be used with individuals who have "a bona fide intellectual impairment." *Id*. at 50:18-24. He believed that Defendant's VIP score ("Inconsistent Responding") indicated that Defendant "gave up when confronted with more difficult items" which was "related to … his borderline intellectual functioning." *Id*. at 48:15-49:14. Dr. Cunliffe further criticized Dr. Feldman's failure to administer an actuarial test to determine if Defendant had deficits in adaptive functioning, rather

14

than relying solely upon her interviews with Defendant and the monitored calls. *Id*. at 44:11-25.

Finally, Dr. Cunliffe confirmed that, in his opinion, Defendant should be found incompetent to proceed. *Id*. at 67:7-9. Dr. Cunliffe based this determination on "two main factors," namely Defendant's "verbal comprehension and neurocognitive problems." *Id*. at 104:11-14. Dr. Cunliffe acknowledged that the "neurocognitive issues" he identified are not based upon any medical records, which is why he diagnosed Defendant with an "unspecified" neurocognitive disorder. *Id*. at 104:15-19.

### 2. Dr. Feldman's Testimony

Dr. Feldman has a Ph. D. in clinical psychology and has worked at FDC-Miami since 2004. ECF No. [57] at 133:17-18, 135:4-6. She is currently a forensic psychologist and was previously a staff psychologist. Id. at 134:5-9. Dr. Feldman has completed approximately 500 competency evaluations. *Id*. at 138:5-8. Dr. Feldman met with Defendant on two occasions, April 20, 2022 and May 31, 2022, for a total of three (3) hours. *Id*. at 181:20-182:1.

Defendant's medical records reflected that he underwent several psychological screenings while in the Special Housing Unit ("SHU") at FDC-Miami because he reported suicidal ideations. *Id*. at 140:6-8, 19-22. No mental health concerns were noted in those records. *Id*. at 140:3-5. Dr. Feldman explained that during the final psychological screening, Defendant "acknowledged that he was not experiencing any suicidal ideation, but feeling angry and frustrated because he was in the SHU … longer than he felt was necessary." *Id*. at 140:25-141:4.

The only competency related measure that Dr. Feldman administered to Defendant was the GCCT. *Id*. at 202:7-10. Dr. Feldman used the GCCT to assess for Defendant's factual level of understanding, and acknowledged that it does not assess for Defendant's rational understanding of the charges against him. *Id*. at 146:4-9. Defendant received a score of 48, which Dr. Feldman said

is consistent with individuals malingering.  *Id*. at 149:1-3.  Dr. Feldman explained that "genuinely

incompetent" defendants typically score between 60 and 70 on the GCCT, so Defendant's score

"was significantly below individuals who are deemed incompetent to proceed."  *Id*. at 148:25-

149:5.  Dr. Feldman acknowledged that she could not rely on the GCCT to determine Defendant's

competency because the test showed that he was malingering.  *Id*. at 202:11-13.

Dr. Feldman also discussed her review of Defendant's monitored telephone calls while at

FDC-Miami.  She stated that Defendant's statements during those calls are not consistent with Dr.

Cunliffe's findings because "there are multiple examples of Mr. Williams' higher level of

knowledge," such as his knowledge that "his criminal history is going to add more time to his

offense."  *Id*. at 151:23-152:8. In making that conclusion, Dr. Feldman relied upon Defendant's

statement during one of the calls that "Yeah, 'cause it's like my background, my background is so

F'd up, you know what I mean.  That is what they are using against me right now.  You feel me."

*Id*. at 152:9-15.

Dr. Feldman also relied upon Defendant's statements during his calls that "[i]t look more

like a grand theft auto than a carjacking, know what I mean … we gonna try to see if we could …

try to get the sh*t rolled, rolled down to a regular grand theft auto and get it sent back to the state,

you know.  If it gets back to the state I could be able to bond back out and sh*t."  *Id*. at 154:21-

155:1.  Dr. Feldman believed these statements "show a clear understanding that [Defendant] is

aware of the difference between Federal and State charges" and "understands it is more likely that

he'd get released in the state system."  *Id*. at 155:5-9.  Dr. Feldman believed that the language

Defendant used during his monitored telephone calls "is sufficient to indicate an understanding of

the legal system."  *Id*. at 201:17-21.

Further, Dr. Feldman stated her view that the "parroting" that Dr. Cunliffe believed

reflected in these calls "is actually a positive thing, that he is able to take the information that his attorney has provided to him and share that information on the telephone call multiple times to different listeners." *Id*. at 151:15-20. In Dr. Feldman's view, this shows that Defendant "is clearly absorbing the information, recalling the information, and meaningfully communicating that to others." *Id*. at 151:20-22. Dr. Feldman also noted that the collateral records she reviewed, including Defendant's educational records, were not consistent with the assertion that Defendant had an unspecified neurocognitive disorder. *Id*. at 162:20-163:2. Dr. Feldman thought it was "a complete leap" for Dr. Cunliffe to diagnose Defendant with an unspecified neurocognitive disorder because Dr. Cunliffe "did not administer any objective neuropsychological test [or] even a neuropsychological screening measure." *Id*. at 176:22-25.

Dr. Feldman did not believe that Defendant suffered from any intellectual deficits. *Id*. at 170:3-4. She reached this conclusion based upon the documentation she reviewed, including evaluations by different psychologists at FDC which did not indicate any adaptive functioning deficits, and the fact that Defendant was able to manage himself independently in the penal environment without any communication problems. *Id*. at 170:8-171:9. Dr. Feldman also noted that during his monitored telephone calls, Defendant discussed a variety of topics and asked about other individuals facing legal charges. *Id*. at 171:3-9. Further, Dr. Feldman stated that a "borderline" IQ score "is not intellectual deficit." *Id*. at 179:1-4.

With respect to malingering, Dr. Feldman agreed that "an individual can be malingering and [be] incompetent." *Id*. at 183:11-14. She also agreed that Defendant's scores on the SIRS-2 test and VIP could not be used to conclude that Defendant fabricated cognitive impairment. *Id*. at 199:20-200:2. Finally, Dr. Feldman confirmed that she "did not diagnose any significant mental disease or defect that would interfere with [Defendant's] competency." *Id*. at 169:6-7.

Following the conclusion of the first competency hearing, the undersigned determined that additional evidence was necessary before the Court could make an ultimate competency determination.  Dr. Cunliffe's report was incomplete in material respects, as Dr. Cunliffe himself acknowledged that more information was necessary before he could decide whether Defendant suffered from an intellectual disability or a neurocognitive disorder.  Similarly, Dr. Feldman's opinions were conclusory and lacked sufficient factual support.  Therefore, without objection from the Parties, the undersigned ordered that Defendant undergo further psychological evaluation. ECF No. [62].

### E.  Dr. Conlon's Report

Defendant was thereafter transferred from FDC-Miami to the Federal Metropolitan Correctional Center in Chicago, Illinois ("MCC-Chicago") in September, 2022.  Dr. Kristin Conlon, a forensic psychologist at MCC Chicago, conducted a competency evaluation of Defendant and issued her report on November 23, 2022. ECF No. [75-1].  In connection therewith, Dr. Conlon reviewed the same records as Dr. Cunliffe, as well as: (i) a National Crime Information Center report dated April 26, 2021; (ii) the Superseding Indictment; (iii) Defendant's monitored telephone calls at FDC-Miami on March 21 and 28, 2022, and April 6, 2022; (iv) the parties' legal memoranda and Court Orders entered in this case regarding Defendant's competency; (v) Dr. Cunliffe's report; (vi) Dr. Feldman's report; (v) the transcript of the first Competency Hearing; (vi) BOP security (SENTRY) and Psychology Data System (PDS) records regarding Defendant; (vii) Bureau Electronic Medical Records (BEMR) regarding Defendant; and (viii) a "sampling" of Defendant's monitored telephone calls while at MCC-Chicago.  *Id*. at 1-2.  Defendant was housed on the same floor as Dr. Conlon's office, so she made frequent casual observations of Defendant, and interviewed staff members at MCC-Chicago, to assess Defendant's adaptive functioning skills.

*Id*. at 2.   Dr. Conlon also utilized the following psychological assessment tools: (i) clinical interviews and mental status examinations of Defendant, (ii) WAIS-IV, (iii) VIP, (iv) PAI, (v) SIRS-2, (vi) ILK and (vii) Revised Competency Assessment Instrument ("RCAI").   *Id*. at 2-3.

Dr. Conlon found that "[t]hroughout the evaluation, there was no observable indication of impairment or functioning or symptomatology suggestive of a severe and persistent mental illness."   *Id*. at 9.   She noted that Defendant "displayed the ability to think critically about his situation" and "demonstrate[d] sustained focus and attention throughout interviews of up to an hour and a half."   *Id*. at 8.   Dr. Conlon described Defendant as a "poor historian overall" who provided accounts that were inconsistent with information he previously told to Dr. Cunliffe or Dr. Feldman, or which contradicted available documentation.   *Id*. at 3.   She noted that "[r]eported lapses in [Defendant's] understanding and memory appeared to improve after [Defendant] was informed that defendant[s] who are found incompetent do not typically have their charges dismissed."   *Id*. at 10.

Defendant was seen for a suicide assessment on September 27, 2022, shortly after his arrival to MCC-Chicago following his unsuccessful request for a unit change.   According to Dr. Conlon, the documentation indicated that Defendant "denied suicidal ideation, plan, or intention when seen by psychology and instead made statements that he was hearing voices and requested to be single celled or placed on suicide watch." *Id*. at 8.   No functional impairment was noted in the assessment, and the psychologist "noted it seemed likely [Defendant] was attempting to make threats for the purpose of moving off the unit."   *Id*.   Two days later, on September 29, 2022, Defendant was seen for a second suicide risk assessment because he stated he was suicidal and made superficial cuts to his arm. *Id*. at 9.   Defendant reported that he did so because other inmates on the unit were bullying him.  *Id*.  However, Defendant later admitted to Dr. Cunliffe that he made

the superficial cuts "in an attempt to secure a cell transfer."  ECF No. [91-1] at 13.

Defendant was then assigned to a new unit, where Dr. Conlon's office was located, which allowed her to "make more detailed observations regarding Mr. Williams' behaviors during times he was unaware he was being observed."  ECF No. [75-1] at 9.  Dr. Conlon's observations of Defendant "clearly indicated [that he had] good control over activities of daily living."  *Id*. at 9. She also noted that he "possessed a good understanding of the role of various disciplines, had a good understanding how to contact other departments, and was able to advocate for his own needs and requests."  *Id*.

Dr. Conlon explained that Defendant scored in the bottom two percent on the WAIS-IV, which places him in the Extremely Low to Borderline range, although she believed that his full-scale IQ score was closer to the upper end of that range.  *Id*. at 11-12.  He performed relatively worse on the Verbal Comprehension Index and the Processing Speed Index (which measures a person's ability to process non-verbal information quickly and accurately).  *Id*. at 12.  Dr. Colon believed that Defendant put forth "good effort" on the WAIS-IV test, and his results on the VIP made it "likely" that Defendant's performance on the WAIS-IV "is a good indication of his true abilities."  *Id*. at 12-13.  Dr. Feldman also found that Defendant's scores on the PAI, SIRS, and ILK tests "did not provide overwhelming or consistent support for Malingering and he does not meet criteria at this time."  *Id*. at 16.

In addition to Defendant's test performance, Dr. Colon described her review of a "sample" of monitored telephone calls that Defendant made at MCC-Chicago.  She stated that his speech during the calls was "coherent, organized, clear, and goal-directed."  *Id*. at 10.  She noted that Defendant was "inquisitive about updates regarding others, which is indicative of his ability to track and follow-up with information over time."  *Id*. at 10-11.  Dr. Conlon also noted that

Defendant was "able to track case-specific information about other people he knew who had active legal cases" and "conveyed information to his mother about the rules and procedures at MCC Chicago, suggesting he benefited from repeat exposure over time." *Id*. at 11.

Further, Dr. Conlon described her assessment of Defendant's three monitored telephone calls while at FDC-Miami. She found that Defendant's statements on these calls indicated that he: (i) "understood his current charges and possible sentences he may face," (ii) understood he "may face less time if he accepted a plea deal than if he lost at trial," (iii) understood that "his criminal background negatively impacted his current legal predicament," and (iv) "understood the amount of time he is facing may surpass the amount of time his mother has left to live." *Id*. at 11. She also noted that Defendant discussed negotiating the terms of the plea deal with his attorney and "recalled potential strategy points he had supposedly discussed with his attorney and indicated it was important to tell [his attorney] everything." *Id*.

Dr. Conlon explained the results of the RCAI, which measures a defendant's factual and rational competency related abilities. *Id*. at 18. As a general matter, Dr. Conlon noted that despite his intellectual challenges, Defendant demonstrated "an ability to learn over time with repeated exposure." *Id*. She also stated that Defendant "tended to retain information better if presented visually rather than verbally." *Id*. Defendant put forth "adequate effort" during the RCAI, which is a semi structured interview that took place over three sessions. *Id*.

Dr. Conlon concluded that Defendant's factual and rational understanding of the current legal proceedings "appear to be intact." *Id*. at 18. She based that conclusion on the following findings. With respect to Defendant's appreciate of the charges, Dr. Colon found that he correctly described the charges against him, understood that it was a felony which is more serious than a misdemeanor, indicated that carjacking is different than grand theft auto because carjacking

involves "force," and provided his account of the incident giving rise to the Indictment in terms that were clear, coherent, and reality based. *Id*. at 18.  Dr. Conlon also found that Defendant correctly understood appropriate behavior in the courtroom. *Id*. at 20.

Further, Defendant correctly described the role of a public defender.  Dr. Conlon used visual aids and repeatedly provided explanations to Defendant regarding the role of other key players in the courtroom, following which Defendant was able to correctly describe, in his own words, the role of the prosecutor, the judge and the jury. *Id*. at 19.  Defendant understood that if he goes to trial, evidence may be presented and witnesses may be called by either party. *Id*. at 20. After explanation from Dr. Conlon, he understood that defendants do not always testify in their own cases. *Id*.  When Dr. Conlon asked Defendant how he would respond if his lawyers advised him not to testify, he "stated that he would listen to and consider the advice but would make a decision he felt was best for him based on the details of the case." *Id*.

With respect to possible sanctions, Defendant correctly understood the difference between a guilty plea and a plea of not guilty. *Id*. at 19.  He also correctly understood that a defendant "might get less time" by "pleading guilty" and that, if a defendant does not accept a plea agreement and loses at trial, the defendant will like face "more time" than the sentence originally offered. *Id*. Dr. Conlon explained that Defendant "stated that if his attorney encouraged him to accept a plea bargain, he would listen to and consider discussion points, but would decide what he felt was best for him." *Id*.  Defendant also indicated that his decision whether to accept a plea agreement "would depend on the quality of evidence against him and the amount of time offered." *Id*.  It was necessary for Dr. Conlon to repeatedly explain the meaning of a Not Guilty by Reason of Insanity plea, following which Defendant was able to explain that it occurs when a person "was so mentally out of it they not responsible for the crime." *Id*.  Defendant also required repeated explanation

from Dr. Conlon to understand that a defendant loses the right to appeal or go to trial if he accepts a plea agreement. *Id*.

As part of her competency evaluation, Dr. Conlon questioned Defendant about a hypothetical criminal case. She found that Defendant was able to adequately critique the quality and strength of the evidence presented on behalf of and against the hypothetical defendant, weigh which pieces of information were more relevant to a possible defense strategy and demonstrated a rational understanding of how the hypothetical defendant could assist in his own defense. *Id*. at 20. Dr. Conlon also found that when asked what type of plea the hypothetical defendant should enter, Defendant offered "a rational response that considered the quality and strength of the evidence, the amount of time offered by the hypothetical prosecutor, and the likelihood the defendant would be found guilty at trial." *Id*.

Finally, Dr. Conlon diagnosed Defendant with various substance abuse disorders, antisocial personality disorder and borderline intellectual functioning. *Id*. at 15. She explained that borderline intellectual functioning is "difficult to differentiate from mild intellectual development disorder, with the primary difference being a [a] lack of significant deficits in adaptive functioning." *Id*. at 16. Based on her observations of Defendant at MCC-Chicago and discussions with staff members, Dr. Conlon found that Defendant's adaptive functioning was less impaired than typical of an individual with Defendant's IQ scores, and she therefore diagnosed him with borderline intellectual functioning, rather than mild intellectual development disorder. *Id*. at 16. She also disagreed with Dr. Cunliffe's diagnosis of an unspecified neurocognitive disorder, concluding that there is an insufficient basis for that diagnosis because, among other reasons, Defendant gave conflicting accounts of his history of head injuries and there are no supporting medical records. *Id*. at 17.

Dr. Conlon opined that none of the disorders she diagnosed impacted Defendant's competency-related abilities.  *Id*. at 21.  She also recommended that if Defendant displayed difficulty understanding new case-related information, the following measures could help ensure that the difficulty does not impact his understanding of the proceedings: (i) take extra time to repeat information, (ii) offer information in a visual format and (iii) ask Defendant to repeat his understanding of the information.  *Id*.

### F.  Dr. Cunliffe's Addendum

On March 12, 2023, Dr. Cunliffe issued an addendum to his original report based upon Dr. Conlon's competency evaluation.  This evaluation lasted six hours and took place while Defendant was housed in the Special Housing Unit ("SHU") at FDC-Miami.  ECF No. [91-1].  The second assessment consisted of a clinical and forensic interview, mental status examination, Criminal Competencies Assessment Procedure ("CCAP") and competency to stand trial, all of which lasted two hours on February 28, 2023, and administration of the following tests on March 1, 2023: (i) Comprehensive Test of Nonverbal Intelligence – Second Edition ("CTONI-2"); (ii) Vineland Adaptive Behavior Scales, 3rd Edition ("Vineland-3"); (iii) Wechsler Individual Achievement Test ("WIAT-4"); (iv) ILK; and (v) VIP.[5]  *Id*. at 3.

Dr. Cunliffe stated that Defendant's testing results indicated that his intellectual functioning is "extremely low to borderline."  *Id*. at 5.  Defendant told Dr. Cunliffe that his mother delayed his start of kindergarten by one year so that his younger brother could become old enough to go to school with Defendant and help him.  *Id*. at 14. Dr. Cunliffe believed that Defendant's verbal reasoning and word knowledge are "the most salient issues" regarding his competency to stand trial and work with his attorneys.  *Id*.  Dr. Cunliffe concluded that the "basis of [Defendant's]

---

[5] *See* ECF No. [94] at 17.

incompetency" is his "extremely low … ability to reason with words, word knowledge, and explain abstract concepts." *Id.* Dr. Cunliffe also concluded that "there is limited or a lack of persuasive evidence that [Defendant] was attempting to malinger" and believed that Defendant's scores were "related to effort and attention problems caused by difficulties understanding and/or reading test items." *Id.* at 9.

Dr. Cunliffe explained that it was frequently necessary to repeat questions to Defendant so that he could understand, and Defendant's expressive and receptive language abilities were very low. *Id.* at 15. Defendant's scores on the CTONI-2, which uses nonverbal formats to estimate general intelligence, suggested that his intellectual functioning is equivalent to five- to eight-year-old children. *Id.* at 19. Defendant's scores in the receptive and expressive language categories on the Vineland-3, which is a structured interview of adaptive functioning, indicated that Defendant's functioning is equivalent to a three-and-a-half-year-old. *Id.* However, Dr. Cunliffe later admitted that those scores have "limit[ed] validity." ECF No. [94] at 79. Defendant's oral language scores on the WIAT-4 were "extremely low," as were his listening comprehension and oral expression scores. *Id.* at 21-22.

With respect to Defendant's competency to stand trial, Dr. Cunliffe made the following findings. Defendant correctly identified the charge against him, adequately described the events that led to his arrest, understood that a felony is more serious than a misdemeanor, and adequately understood the evidence against him. *Id.* at 23. Dr. Cunliffe found that Defendant understood the different possible sanctions which the Court could impose, and adequately understood the adversarial nature of the American legal process and the roles of different professionals and witnesses in court. *Id.* at 23-24. Dr. Cunliffe further found that Defendant was able to disclose the relevant facts of the case to counsel and the court, and his comments regarding the events which

led to his arrest was rational. *Id*. at 24. This finding contradicts a later conclusory statement in Dr. Cunliffe's report that Defendant's "ability to disclose relevant facts to counsel or the court, and testify and participate in his own defense did not appear adequate." *Id*. at 25.

Defendant understood most of the different pleas available, although Dr. Cunliffe had to review the meaning of Not Guilty by Reason of Insanity with Defendant several times before he could grasp it, and Defendant did not understand the meaning of a No Contest plea despite Dr. Cunliffe's attempts to educate him. *Id*. When asked for the meaning of a plea bargain, Defendant stated that "the judge offers a plea, and you take it or don't take it; my lawyer comes and tells me what the judge's offer is and I have to say if I want it or not." *Id*. Nonetheless, Dr. Cunliffe believed that Defendant "did not seem to understand that it was his right to refuse an offer from the prosecution nor did he seem to comprehend the judge's involvement in the process." *Id*. When discussing a plea bargain in this case, Defendant stated that "my lawyer says 25 years." *Id*.

Dr. Cunliffe determined that Defendant's capacity to make legal decisions, weigh his options, understand legal procedure, and exercise his legal rights did not appear adequate because he was "prone to acquiescing." *Id*. at 25. Defendant told Dr. Cunliffe that he often does not understand what is said in court, and Dr. Cunliffe believed that Defendant "did not seem to understand his [attorneys'] strategy," although Dr. Cunliffe did not provide any basis for his belief. *Id*. Dr. Cunliffe stated that Defendant "did not seem to fully appreciate the risks of testifying in his own defense," and his capacity to avoid self-incrimination "seemed to be very low." *Id*.

Finally, Dr. Cunliffe diagnosed Defendant with (i) various substance abuse disorders, (ii) posttraumatic stress disorder, (iii) moderate major depressive disorder, (iv) mild intellectual developmental disorder, (v) unspecified neurocognitive disorder, (vi) borderline personality disorder, and (v) antisocial personality disorder. *Id*. at 23. He concluded that "the source of

[Defendant's] competency problems appears to rest on three factors: a possible neurocognitive disorder, an intellectual impairment and severe verbal comprehension problems." *Id*. at 26. Dr. Cunliffe further explained that the "central feature" of Defendant's incompetency to stand trial "rests on the difficulties he experiences understanding his communications with his attorneys, directing them as to his wishes, and making fully informed and well-reasoned legal decisions." *Id*. at 27.

Dr. Cunliffe opined that Defendant is incompetent to stand trial and waive his Miranda rights. *Id*. He explained that the basis of his opinion was that Defendant did not seem to fully appreciate "the possible sanctions which could be levied against him by the court" or "the adversarial nature of the American legal system," his ability to patriciate in his own defense, testify relevantly and understand legal procedure and legal terms "was low," and Defendant "did not seem capable of avoid self-incrimination." *Id*. Many of these reasons contradict the findings and conclusions that Dr. Cunliffe made regarding Defendant's competency as detailed above, yet Dr. Cunliffe did not explain this apparent discrepancy or provide additional support for his opinion.

Dr. Cunliffe again suggested that Defendant undergo an additional two or three months of treatment "related to restoration of competence." *Id*. He provided the same justifications as in his initial report, namely to "1) attempt competency restoration treatment since [Defendant's] capacity for attaining competency is not currently fully understood, 2) further evaluate the nature of [Defendant's] cognitive problems, and 3) more closely assess [Defendant's] difficulties which bear on his competency." *Id*. Dr. Cunliffe advised that "it is not clear whether [Defendant] will be able to be restored to competency given the chronic and 'hardwired' nature of his problems…." *Id*. Nonetheless, Dr. Cunliffe again stated that it is "premature" to conclude that Defendant cannot be restored to competency "given the information currently available and his limited history of

competency restoration treatment."  *Id*. at 28.

### G.  The Second Competency Hearing

The Court held a Second Competency Hearing on March 14, 2023 at which Dr. Cunliffe and Dr. Conlon testified.  ECF No. [94].  The undersigned summarizes the relevant portions of their testimony below.

### A.  Dr. Cunliffe's Testimony

Dr. Cunliffe explained that he conducted the second evaluation to determine if Defendant's competency had changed because competency is a present standard.  *Id*. at 9:22-23.  He testified that there are three areas in which Defendant was not competent as a result of Defendant's impaired ability to understand language and his receptive and expressive language abilities: (1) work with his lawyers, (2) make reasoned decisions and (3) understand the legal proceedings.  *Id*. at 10:13-19.  Dr. Cunliffe explained that Defendant's oral language scores on competency related tests were "around the first grade."  *Id*. at 13-15.  However, Dr. Cunliffe also testified that Defendant's intellectual functioning "is not severe" and Defendant "is not even in the moderate range" but, rather, "is in the mild range in [his] estimation."  *Id*. at 33:14-18.  Dr. Cunliffe confirmed that a diagnosis of mild intellectual disorder is a factor in determining a person's competency but does not "alone make them not competent."  *Id*. at 34:1-7.

Dr. Cunliffe believed that Defendant lacked the ability to make decisions regarding whether to go to trial or testify in his defense, and would be at risk of incriminating himself because Defendant tended to parrot back information and acquiesce.  *Id*. at 37:6-38:2.  He also believed that Defendant did not adequately understand a plea bargain because Defendant "thought he should get time served and be able to go home" and although Defendant "understood [the plea offer] was 25 years, he did not seem to fully understand that he did not really have a lot of options in that."

*Id*. at 41:8-13, 42:1-4.  Dr. Cunliffe acknowledged that his interactions with Defendant "would limit validity" of his findings that Defendant's receptive and expressive language abilities were the equivalent of a three-year-old because Defendant was able to have communications with his attorneys and Dr. Cunliffe about the criminal justice system, which exceeds the capabilities of a child.  *Id*. at 79:13-17.  In particular, Dr. Cunliffe agreed that Defendant (i) sufficiently identified the charges against him, (ii) correctly identified the different possible sanctions against him, (iii) understood some legal terms, (iv) understood that he could face up to 25 years in prison or that he could face up to life imprisonment, (v) was able to explain the different functions of people in the courtroom, including the different kinds of witnesses who could testify at trial, (vi) described the events that led to his arrest, (vii) had an appreciation of why he was arrested, and (viii) made comments about his charges and allegations that appeared both factual and rational.  *Id*. at 77:

Additionally, Dr. Cunliffe criticized portions of Dr. Conlon's report. When he reviewed Dr. Conlon's raw data, he found that Defendant's full-scale IQ was 67, rather than 69 as Dr. Conlon found, which would place Defendant in the mild range of intellectual functioning instead of on the cusp of the borderline range.  *Id*. at 46:9-21.  He further believed that Dr. Conlon should have conducted an actuarial assessment of Defendant's adaptive functioning, rather than relying on her observations of Defendant and conversations with correctional staff.  *Id*. at 48: 11-22.  However, Dr. Cunliffe readily admitted that he made the same mistake by not conducting an actuarial assessment of Defendant during his second competency evaluation.  *Id*. at 22-24.  Dr. Cunliffe also believed that Dr. Conlon's conclusion that Defendant's difficulties understanding did not affect his competency was inconsistent with the fact that Dr. Conlon "had to frequently rephrase questions and provide education so he could understand."  *Id*. at 51:9-17.

Lastly, Dr. Cunliffe stated that Defendant's expressions of suicide ideation or his

superficial cutting to obtain unit changes did not affect his competency determination because they have "absolutely nothing to do" with Defendant's verbalization skills and his ability to communicate effectively. *Id*. at 86:21-87:13. Dr. Cunliffe confirmed that in his opinion, Defendant is not competent to stand trial. *Id*. at 92:11-13.

### B. Dr. Conlon's Testimony

Dr. Conlon holds a Ph. D. in clinical psychology. *Id*. at 95:23. She is employed by BOP, currently as a forensic evaluator at MCC-Chicago and previously as a staff psychologist at FDC-Philadelphia. *Id*. at 94:19, 94:25-95:11. Prior to her employment with BOP, she worked at a state psychiatric hospital in New Jersey. *Id* at 94:20-22. Dr. Conlon has conducted approximately thirty-five forensic evaluations during her career. *Id*. at 95:18-20.

She evaluated Defendant over a period of one month and met with him nine (9) times. *Id*. at 99:9-24. Given the proximity of her office to Defendant's cell, Dr. Conlon encountered Defendant once or twice a week and had informal discussions with him outside of the formal evaluation. *Id*. at 100:7-13. She explained that in addition to psychological testing and interviews, a "big component" of her ultimate opinion on competency was her own behavioral observations of Defendant and the observations of other staff who interacted with him, as well as his monitored phone calls at MCC-Chicago and FDC-Miami and his school records. *Id*. at 104:10-20.

Dr. Conlon believed that Defendant's success in obtaining a unit change, after first making a request through appropriate channels which was denied, then expressing suicide ideation and making superficial cuts on his arms which resulted in a unit change, demonstrated that "[h]e was able to generate alternative positions that he would take fairly quickly in the moment that would help him obtain his desired goal to move off the unit." *Id*. at 109:17-111:21; 132:16-20. She did not observe that Defendant suffered from any adaptive functioning impairments during the

evaluation period because Defendant was able to put out his laundry, make commissary purchases, and maintain good hygiene.   *Id*. at 115:4-116:2; 118:12-14.  She also noted that Defendant was able to interact with staff to relay his concerns and socialize with other peers on his unit.  *Id*. at 122:19-21.

Dr. Conlon testified that her behavioral observations of Defendant indicated that he was able to function at a higher level than his self-report suggested.  Id. at 125:11-13. She noted that there were inconsistencies between information he reported to her as opposed to Drs. Feldman and Cunliffe, and when she confronted him with those inconsistencies, Defendant "drew comparisons between questions and contrasted those questions in terms of what he was being asked."  *Id*. at 124:16-20.

Dr. Conlon agreed with Dr. Cunliffe's findings that: (i) Defendant could identify the current charges against him, describe the events leading to his arrest, and appreciate why he was arrested; (ii) Defendant's comments about the charges and allegations appeared factual, cogent and rational; (iii) Defendant could distinguish between carjacking and grand theft auto; (iv) Defendant understood the possible sanctions that could be imposed; (v) Defendant had an adequate understanding of the adversarial nature of the legal system; (vi) Defendant appeared able to consult factually about his case with his attorney; and (vii) Defendant was able to manifest appropriate behavior in court.  *Id*. at 160:1-161:6.  With respect to areas in which Dr. Cunliffe found that Defendant did not have an adequate understanding, Dr. Conlon explained why she reached an opposite conclusion.  She stated that Defendant's initial confusion regarding the difference between state and federal prosecutors "seemed to be related to his past charges [which] were state charges, so he was able to express he understood now that his charges are federal [and] [t]herefore, he has a federal prosecutor."  *Id*. at 153:1-6.  When Dr. Conlon asked Defendant what a plea

agreement was, he "specified [it] is a deal between the prosecution and him where he may get less time if he pleads guilty." *Id*. at 154:14-18.

Dr. Conlon noted that in areas where Defendant initially expressed confusion, he was able to learn over time and retain the information both within the interview and between interviews. *Id*. at 148:3-11; *see also Id*. at 149:21-25 ("[T]here are some domains he expressed confusion about or misunderstanding about, but he appeared to be able to retain that information and be educated."). In a similar vein, Dr. Conlon acknowledged that Defendant initially demonstrated a degree of acquiescence, where "he was sort of agreeable or suggestive" to statements she made but "[a]fter education was offered, he was able to paraphrase the information back to [her] and expressed his understanding of it." *Id*. at 122:23-123:1-9. She noted that when asked how he would respond if his lawyers advised him to testify or accept a plea, "[h]is response always considered his attorneys' advice, but he was able to provide other pieces of information that showed he had his own preferences and his own thought processes." *Id*. at 154:4-9. Dr. Cunliffe stated that Defendant did not give any indication that "he would simply submit to whatever his lawyers wanted him to do regardless of his own preferences." Id. at 154:10-13.

She also disagreed that Defendant simply parroted back information because he was able to put information into his own words after she provided explanation. By way of example, Dr. Cunliffe testified that after she "provide[d] education" to Defendant, he understood his right not to testify meant his right not to "tell on himself." *Id*. at 155:13-20. Dr. Conlon also found that Defendant's responses to the hypothetical scenario they discussed during the competency evaluation demonstrated that he did not simply parrot back information. *Id*. at 159:3-6.

Dr. Conlon explained that she provided "a few brief snippets of [a hypothetical] case involving a kidnapping of somebody by taking them into a vehicle." *Id*. at 157:25-2. She offered

Defendant "facts as examples of evidence" and asked him "to determine which one he believed was more important." *Id*. at 158:2-4. Dr. Conlon stated that Defendant "was able to make a selection and gave his rationale for why he believed those pieces of facts were more important." *Id*. at 158:5-6. She continued to add one additional fact at a time, and asked Defendant what he thought the hypothetical defendant should do "in terms of accept a plea or going to trial, how likely that person … may be found guilty." *Id*. at 158:7-13.

Dr. Conlon found that Defendant "was able to use pieces of education [she] offered him during the competency interview and … demonstrate them in a hypothetical scenario." *Id*. at 158:16-18. He was able to critique evidence, such that when Dr. Conlon said that the only piece of evidence was a witness statement, Defendant stated that the hypothetical defendant may want to go to trial because sometimes a witness may lie. *Id*. at 158:19-24. As Dr. Conlon added additional evidence, Defendant expressed that the case was getting stronger and thought the hypothetical defendant may consider a plea agreement. *Id.* at 158:25-159:2.

Finally, Dr. Conlon acknowledged that there is evidence to suggest Defendant has lower verbal functioning. *Id*. at 172:15-16. She agreed that individuals in the bottom two percent of the population intellectually may have a hard time comprehending information. *Id*. at 179:5-8. Dr. Conlon explained that she diagnosed Defendant with borderline intellectual functioning rather than mild intellectual impairment because "[t]here was no definitive information from his history that he had participated in Special Education classes," he had attended several schools yet denied being held back, and she had not observed adaptive functioning deficits. *Id*. at 129:12-22. However, she acknowledged that if Defendant's self-report is accepted, he was a slow learner, had peer tutoring, and had trouble pronouncing words and difficulty focusing as a child. *Id*. at 191:4-7. Dr. Conlon agreed with Dr. Cunliffe that a mild intellectual disorder is not sufficient in and of itself to

render a person incompetent. *Id*. at 134:10-14. She also stated that there were no indications during her evaluation that Defendant had an intellectual impairment "of the level of severity that would be necessary to render him incompetent." *Id*. at 133:21-24. In her view, while Defendant has difficulties with comprehension, he still has a "sufficient level of comprehension to be able to proceed in this action." *Id*. at 229:1-6. Dr. Conlon confirmed that in her opinion, Defendant is competent to proceed. *Id*. at 159:7-9.

## II.   ANALYSIS

A defendant is incompetent if he is "suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). The standard for competency to stand trial is whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402 (1960). "Incompetency to stand trial is not defined in terms of mental illness. As such, a defendant can be competent to stand trial despite being mentally ill and similarly a defendant can be found incompetent to stand trial without being mentally ill." *United States v. Williams*, No. 5:06-cr-36-Oc-10GRJ, 2007 WL 1655371, at *5 (M.D. Fla. June 7, 2007) (citations omitted). "The determination of whether a defendant is mentally competent to stand trial is a question left to the sound discretion of the district court, with the advice of psychiatrists [or other mental health professionals]. The medical opinion of experts as to the competency of a defendant to stand trial is not binding on the court, since the law imposes the duty and responsibility for making the ultimate decision of such a legal question on the court and not upon medical experts." *United States v. Abernathy*, No. 08-20103, 2009 WL 982794, at *3 (E.D. Mich. Apr. 13, 2009) (alteration in

original) (citation omitted).  When "faced with diametrically opposite expert testimony, a district court does not clearly err simply by crediting one opinion over another where other record evidence exists to support the conclusion." *Battle v. United States*, 419 F.3d 1292, 1299 (11th Cir. 2005) (citations and quotation marks omitted).

The competency inquiry focuses on a defendant's capacity to sufficiently contribute to his own defense to allow for a fair trial.  *Watts v. Singletary,* 87 F.3d 1282, 1286 (11th Cir.1996). It is a functional analysis that requires a case-by-case assessment.  *Id*. at 1289.  This is so because the competency determination looks at the capacity of a particular defendant to play a specific role at trial.  *Id*.

The Eleventh Circuit has found that "a petitioner raising a substantive claim of incompetency is entitled to no presumption of incompetency and must demonstrate his or her incompetency by a preponderance of the evidence."  *United States v. Bradley*, 644 F.3d 1213, 1268 (11th Cir. 2011) (citation omitted); *see also Cooper v. Oklahoma*, 517 U.S 348, 361 (1996) (citing 18 U.S.C. § 4241 and noting that "Congress has directed that the accused in a federal prosecution must prove incompetence by a preponderance of the evidence."); *United States v. Madison*, No. 6:17-cr-15-Orl-37KRS, 2018 WL 1167327, at *2 (M.D. Fla. Mar. 6, 2018) ("Because Defendant has raised a substantive claim that he is not competent, he bears the burden of demonstrating his incompetency by a preponderance of the evidence." (citing *Bradley*, 644 F.3d at 1268)).  Defendant raised the issue of competency, has argued that he is not competent to proceed, and bears the burden of proof.  For the reasons explained below, Defendant has not met his burden.

**A.  There Is Insufficient Evidence That Defendant Is Malingering.**

As an initial matter, the Court rejects Dr. Feldman's conclusion that Defendant was malingering.  Dr. Feldman did not adequately support her conclusion with specific evidence

demonstrating that Defendant's low test scores were the result of malingering as opposed to his intellectual difficulties.  Importantly, neither Dr. Cunliffe nor Dr. Conlon found evidence that Defendant was malingering during their competency evaluations.  ECF Nos. [57] at 39:9-13; [75-1] at 16; [91-1] at 9.  Indeed, Dr. Conlon specifically found that Defendant "does not meet criteria [for malingering] at this time."  ECF NO. [75-1] at 16.  Moreover, during the final oral argument on this matter, the Government did not rely on malingering as a basis to find Defendant competent, thereby appearing to abandon the argument.  A such, undersigned finds that Defendant was not malingering his intellectual impairment.

### B.  Defendant Suffers From Low Intellect.

There is no dispute that Defendant suffers from low intellect, as the forensic testing conducted by both Government and defense experts revealed that Defendant's intellectual functioning is in the bottom one or two percent of the population.  The experts disagree, however, as to the severity of Defendant's intellectual impairment.  Dr. Cunliffe diagnosed Defendant with mild intellectual disorder, which is a degree more severe than Dr. Conlon's diagnosis of borderline intellectual functioning.  It is unnecessary to resolve their disagreement as to the correct diagnosis because, as the experts testified, neither diagnosis renders a defendant competent or incompetent.  Indeed, it is well settled that low intellect alone does not amount to incompetency to stand trial.  *See Smith v. Newsome*, 876 F.2d 1461, 1465 (11th Cir. 1989) (fact that petitioner had low IQ did not mean he was mentally incompetent); *see also Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir. 1995) ("[N]either low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial.") (citation omitted)*; McCune v. Estelle*, 534 F.2d 611, 612 (5th Cir. 1976) (low intelligence does not equal mental incompetency); *United States v. Deruiter*, No. 2:14-cr-46-FtM-38MRM, 2017 WL 9360880, at *26 (M.D. Fla.

Aug. 3, 2017) ("[A] review of relevant case law demonstrates that a low IQ does not necessarily render a defendant incompetent to proceed." (citation omitted); *Gutierrez v. United States*, No. 8:11-cr-313-T-30EAJ, 2014 WL 6473743, at \*7 (M.D. Fla. Nov. 18, 2014) ("[H]aving a low IQ or mental deficiency does not necessarily mean that [a 2255 petitioner] was incompetent to stand trial.") (citation omitted).   Accordingly, for purposes of the analysis herein, the undersigned assumes that the more severe diagnosis applies, namely that Defendant suffers from a *mild* intellectual disorder as Dr. Cunliffe opined.   That being said, because "[n]ot every manifestation of mental illness demonstrates incompetence to stand trial", the Court will now consider whether the evidence presented "indicate[s] a present inability to assist counsel or understand the charges." *Medina*, 59 F.3d at 1107.

### C. Defendant Possesses Sufficient Factual and Rational Understanding And Is Competent to Stand Trial.

As noted above, the standard for competency to stand trial is whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "has a rational as well as factual understanding of the proceedings against him."   *Dusky*, 362 U.S. 402 (1960). Dr. Conlon found that Defendant's factual and rational understanding "appears to be intact" and opined that he is competent to stand trial.   ECF No. [75-1] at 18-21.   Dr. Cunliffe, on the other hand, opined that Defendant's low intellect and verbal comprehension and expressive difficulties rendered him not competent in three areas: (i) ability to consult and work with his lawyers, (ii) ability to make reasoned decisions, and (iii) ability to understand the legal proceedings.   ECF No. [94] at 10:13-19.   As explained below, the record does not establish that Defendant is incompetent in any of these areas.

> **1. Defendant Has Not Met His Burden To Show That He Lacks The Ability To Consult With His Lawyers With A Reasonable Degree Of Rational Understanding.**

Dr. Cunliffe found that Defendant was competent in several key areas relevant to his ability to work with his attorneys.  In particular, as set forth above, Dr. Cunliffe found that Defendant was able to disclose relevant facts to counsel and the court, and his comments regarding the events which led to the offense "seemed rational." ECF No. [91-1] at 24.  Dr. Cunliffe further found that Defendant provided an adequate description of the events which led to his arrest, could adequately describe the charge against him, and his understanding of the evidence against him was adequate. *Id*. at 23.  Dr. Cunliffe also found that Defendant "was able to provide most of the factual information about the legal process." *Id*. at 27.

Despite these findings, Dr. Cunliffe opined that Defendant's "ability to participate in his own defense appeared to be low." *Id*. at 27.  Dr. Cunliffe appears to base that conclusion on his opinion that Defendant tends to parrot back information and acquiesce, which negatively impacts his ability to assist his attorneys in his defense.  ECF No. [57] at 20:6-18, 30:23-31:7.

Dr. Cunliffe's conclusion, however, is inconsistent with the information that Defendant provided.  In particular, Defendant admitted that he fabricated thoughts of suicide and made superficial cuts to his arms at MCC-Chicago in order to obtain a unit change after his request was initially denied.  ECF No. [91-1] at 13.  Rather than accept the denial of his request, Defendant developed and implemented a strategy to obtain his desired result.  Such conduct contradicts Dr. Cunliffe's assertion that Defendant is prone to acquiescence, thereby rendering him unable to assist his attorneys.

Moreover, Dr. Cunliffe spent a relatively brief amount of time with Defendant, four hours on one day during the first evaluation and six hours over two days during the second evaluation.  Given Dr. Cunliffe's limited interactions with Defendant, it is unclear how Dr. Cunliffe could

reliably conclude that Defendant universally repeats information verbatim or acquiesces such that he cannot assist his attorneys.

By contrast, Dr. Conlon interviewed Defendant nine times over the course of one month and frequently interacted with Defendant on a weekly basis. Dr. Conlon provided specific instances where Defendant correctly paraphrased concepts in his own words after she explained the information to him, sometimes repeatedly, even though he initially expressed confusion. She also explained that Defendant was able to retain that information within and between sessions.

Further, Dr. Conlon's report describes instances where Defendant demonstrates an intention to exercise independent thought when deciding how to exercise his legal rights, rather than merely acquiesce. According to Dr. Conlon, "Mr. Williams stated that if his attorney encouraged him to accept a plea bargain, he would listen to and consider discussion points, but *would decide what he felt was best for him*." ECF No. [75-1] at 19 (emphasis supplied). Dr. Conlon also stated that "[w]hen asked how [he] would respond should his lawyer advise him not to testify, Mr. Williams stated he would listen to and consider the advice but *would make a decision he felt was best for him based on the details of the case*." *Id.* at 20 (emphasis supplied).

Dr. Cunliffe reviewed Dr. Conlon's report before issuing his addendum, yet did not address the inconsistency between his assertion that Defendant cannot assist his attorneys because he parrots information or acquiesces, and the instances of contrary conduct that Dr. Conlon described. Given the specificity that Dr. Conlon provided and the extended nature of her evaluation, the undersigned finds Dr. Conlon's report and testimony more persuasive. For the foregoing reasons, the undersigned concludes that Defendant has not proven by a preponderance of the evidence that he is unable to consult with his attorneys with a reasonable degree of factual understanding.

To be sure, Defendant's diagnosis of low intellect might make it more time consuming for his counsel to prepare and otherwise advise Defendant of trial strategy or decisions. However, these difficulties can be addressed by the Court as the trial progresses. They do not warrant a finding that Defendant is not competent to stand trial.

### 2. Defendant Has Not Met His Burden To Show That He Is Unable To Make Rational Decisions.

In his addendum, Dr. Cunliffe found that Defendant's "capacity to make legal decisions, weigh his options, understand legal procedure, and exercise his legal rights did not appear adequate." ECF No. [91-1] at 24. Dr. Cunliffe did not explain the basis of this finding, other than a statement that "[i]n general, [Defendant's] comments about his attorneys and his defense seemed to suggest that he was prone to acquiescing and he was somewhat submissive…." *Id*. It is not evident how that statement supports Dr. Cunliffe's finding, and in any event, the undersigned concluded above that the record does not support Dr. Cunliffe's assertion that Defendant acquiesces to such an extent as to render him incompetent. It is notable that Dr. Cunliffe's finding lacks supporting facts given that other portions of his report set forth examples, and Dr. Cunliffe testified that he "want[ed] to have concrete examples of where I am getting that from and why I think that." ECF No. [57] at 29:7-12.

Dr. Cunliffe's conclusory finding stands in contrast to evidence in the record reflecting that Defendant possesses the capacity for rational decision-making. Dr. Conlon explained that Defendant displayed critical thinking skills during her discussions with him regarding the hypothetical kidnapping case. Specifically, Defendant was able to choose between hypothetical facts and explain why he thought some were more important than others. ECF No. [94] at 158:5-6. Defendant also provided his rationale for how the hypothetical defendant should choose between going to trial or accepting a plea bargain, stating that the defendant may want to go trial

if the only evidence of his guilt is a witness statement because a witness may lie, yet when Dr. Conlon offered additional pieces of evidence, Defendant thought the hypothetical defendant should consider a plea agreement because the case against him was getting stronger.  *Id*. at 158:25-159:2.  For these reasons, Dr. Conlon found that "[w]hen the question was posed about how Mr. Williams believed the defendant should plea, Mr. Williams was able to offer a rational response that considered the quality and strength of the evidence, the amount of time offered by the hypothetical prosecutor, and the likelihood the defendant would be found guilty at trial."  ECF No. [75-1] at 20.

Further, Defendant's behavior in securing a unit change undermines Dr. Cunliffe's opinion. Shortly after arriving at MCC-Chicago, Defendant requested a unit change through appropriate channels. When that request was denied, Defendant falsely expressed suicide ideations and engaged in superficial self-harm, following which Defendant was moved to a different unit.  Dr. Cunliffe did not reconcile his opinion with this conduct, other than stating that it "indicates some coping problems, definitely."  ECF No. [94] at 54:17-19.  By contrast, Dr. Colon explained that Defendant's conduct demonstrated that he "was able to strategize, change his opinion -- form an opinion and select ways in which he could obtain his desired goal."  *Id*. at 121:21-24.  For the reasons explained above, the undersigned gives greater weight to Dr. Conlon's findings and conclusions.  Accordingly, the undersigned concludes that Defendant has not proven by a preponderance of the evidence that he is unable to make rational decisions.

    **3.   Defendant Has Not Met His Burden To Show That He Lacks A Factual And Rational Understanding Of These Proceedings.**

Dr. Cunliffe made several findings that reflect Defendant has a factual and rational understanding of these legal proceedings. Specifically, Dr. Cunliffe found that Defendant (i) "seemed to understand" the different possible sanctions that could be imposed by the Court, (ii)

understood that a felony is more serious than a misdemeanor, (iii) was able to distinguish between charges of carjacking and grand theft auto, (iv) adequately understood the adversarial nature of the American legal process, and (v) adequately understood the roles of different participants in court. ECF No. [91-1] at 23-24.  Dr. Cunliffe supported these findings with specific examples, *id*, yet at the end of his addendum, stated without explanation that Defendant "did not seem to fully appreciate possible sanctions which could be levied against him by the court … [and] did not seem to fully appreciate the adversarial nature of the American legal system." *Id*. at 27.  The undersigned does not credit these unsupported and contradictory assertions.

Further, Defendant's own statements confirm that he understands the possible sanctions he could receive.  For example, during a monitored telephone calls at FDC-Miami, Defendant stated "If I go to trial and lose, they are going to give me a life sentence."  ECF No. [57] at 62:4-6.  Dr. Cunliffe agreed that this statement shows Defendant understands the possibility of receiving a life sentence.  *Id*. at 61:23-62:2.

Defendant's statements also undermine Dr. Cunliffe's assertion that he does not sufficiently understand the adversarial nature of the legal system.   Dr. Cunliffe reasoned that Defendant "seemed very confused" about the difference between the state judicial system and the federal judicial system.  *Id*. at 62:15-18.  However, in one of his monitored telephone calls at FDC-Miami, Defendant stated that this case "look[s] more like a grand theft auto than a carjacking, know what I mean … we gonna try to see if we could … try to get the sh*t rolled, rolled down to a regular grand theft auto and get it sent back to the state, you know.  If it gets back to the state I could be able to bond back out and sh*t."  *Id*. at 154:21-155:1. Further, according to Dr. Conlon, Defendant "recognized that while he has previously had State attorneys for State cases, his case is now federal."  ECF No. [75-1] at 19.  And importantly, Dr. Cunliffe found that Defendant "*did*

seem to understand that a U.S. Attorney was working against him in a court of law." ECF No. [91-1] at 24 (emphasis supplied).

Additionally, Dr. Cunliffe opined that Defendant "did not seem capable of avoiding self-incrimination." *Id*. at 27. Dr. Cunliffe did not provide any explanation for his assertion. To the extent that Dr. Cunliffe was relying on his belief that Defendant parrots information and acquiesces, the undersigned finds this unpersuasive for the reasons discussed above.

Finally, Dr. Cunliffe opined that Defendant's capacity to understand legal terms, including the types of pleas available and the plea bargain process, was inadequate. ECF No. [91-1] at 25, 27. Notably, "the standard for mental competence does not require that a defendant have a clear understanding of legal terminology, or that he be able to read and understand a legal document without assistance." *United States v. Greene*, 767 Fed. App'x 793, 797 (11th Cir. 2019). Further, Dr. Cunliffe's opinion is at odds with specific findings in his report. Dr. Cunliffe found that Defendant "was able to [correctly] define Guilty and Not Guilty" and was able to "grasp [the] meaning" of Not Guilty by Reason of Insanity after Dr. Cunliffe reviewed it with him several times. *Id*. at 25. Dr. Cunliffe also found that Defendant "was able to provide adequate definitions of a sentence, recess, and an appeal" and "appeared to know what testifying in court means." *Id*. Further, Defendant "seemed to understand the process of entering a plea in court" and, when discussing a plea bargain his case, stated that "my lawyer says 25 years." *Id*.

Dr. Cunliffe focused on the fact that Defendant thought that the judge, rather than the prosecutor, makes a plea offer and "did not seem to understand that it was his right to refuse an offer from the prosecution." *Id*. However, Defendant's responses to Dr. Conlon indicate the contrary. According to Dr. Conlon: (i) "Mr. Williams articulated a plea agreement is a deal between the defendant and prosecution whereby the defendant 'might get less time' by 'pleading

guilty',” (ii) Defendant “indicated if a plea agreement is not accepted, and one loses at trial, they will likely face “more time” than what was otherwise offered,” and (iii) “[w]ith education, Mr. Williams was able to understand and paraphrase that if a defendant accepted a plea deal, that individual would forfeit the right to appeal or go to trial.”).  ECF No. [75-1] at 19.

Moreover, Defendant's monitored telephone calls contradict Dr. Cunliffe's opinion that Defendant does not sufficiently understand a plea bargain.  For example, Defendant stated “they're coming with a plea now, they're coming here talking about 25 years.  They added another charge, they are fitting to indictment me on another charge.  The max of the first is 15 years.”  ECF No. [57] at 61:1-4.  Dr. Cunliffe could not reconcile his opinion with Defendant's statements, testifying that “I think he knows there is another charge coming, whether he fully comprehends what is going on and the reason for that, and what the differences would be, and whether he would be able to fully participate in a plea agreement or plea colloquially, *I am not so sure*.”  *Id*. at 61:9-16 (emphasis added).

Defendant also stated that “Yeah, ‘cause it's like my background, my background is so F'd up, you know what I mean.  That is what they are using against me right now.  You feel me.”  *Id*. at 152:9-15.  Dr. Cunliffe agreed that these statements show that Defendant “understands his criminal history has a role to play in plea deals, plea negotiations.”[6]  *Id*. at 116:23-117:8.  Further, Defendant stated that “I was gonna take 15, I will be out in 11.”  *Id*. at 117:8.  When asked whether this statement demonstrates that Defendant “clearly understands that there is gain time in the system and he is analyzing what type of gain time he might get if he takes, for example 15 years, as opposed to 20 years…,” Dr. Cunliffe testified “I will give you that, yes.”  *Id*. at 117:17-21.

---

[6] Dr. Cunliffe initially testified that he thought Defendant made those statements “because the lawyer told him that,” but Dr. Cunliffe readily conceded “[t]hat is *an assumption* I am making based on what I see before me.”  *Id*. at 117:8-12 (emphasis supplied).

Given the record before the Court, the undersigned concludes that Defendant has not proven by a preponderance of the evidence that he lacks a factual and rational understanding of these proceedings.

## III.   CONCLUSION

In sum, Defendant has not shown that he is incompetent by a preponderance of the evidence.  Dr. Cunliffe's report and testimony is either conclusory or inconsistent in critical areas relevant to Defendant's alleged incompetence.  The undersigned gives greater weight to Dr. Conlon's findings and conclusions, as they are more detailed and based on more extensive interviews of and interactions with Defendant over a longer period of time.

Further, Dr. Cunliffe recommended that Defendant be referred for inpatient competency restoration, which is at odds with his opinion that Defendant's intellectual deficits render him incompetent.  Indeed, Dr. Cunliffe's recommendation is more consistent with Dr. Conlon's assessment that Defendant is able to learn if sufficient time is spent explaining the information to him using various formats.

For the foregoing reasons, assuming that Defendant suffers from a mental disease or defect, namely mild intellectual disorder, I find that he is able to understand the nature and consequences of the proceedings against him, and has a sufficient present ability to consult with his lawyers with a reasonable degree of rational understanding such that the is able to assist in his defense. Accordingly, I conclude that Defendant is competent.

## IV.     RECOMMENDATION

Based on the foregoing, it is hereby **RECOMMENDED** that Defendant be found competent.

## V.     OBJECTIONS

In light of the upcoming calendar call, and given that the Court provided the parties ample time to present oral argument, the parties will have until **May 1, 2023** within which to file written objections, if any, for consideration by the United States District Judge.  Any request for an extension of this deadline must be made by **close of business on April 27, 2023**.  Pursuant to Fed. R. Crim. P. 59(b), Eleventh Circuit Rule 3-1, and accompanying Internal Operating Procedure 3, the parties are hereby notified that failure to object in accordance with 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions.  *See Thomas v. Arn*, 474 U.S. 140 (1985).

**DONE AND SUBMITTED** in Chambers in Miami, Florida on April 26, 2023.

_____
**JACQUELINE BECERRA**
**UNITED STATES MAGISTRATE JUDGE**